

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED
**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 8, 2016**

**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KRISTIN BRUNER-HALTEMAN, | § | CASE NO. 12-32429-HDH-13 |
| | § | |
| Debtor. | § | |
| | § | |
| KRISTIN BRUNER-HALTEMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADV. NO. 14-03041-HDH |
| | § | |
| EDUCATIONAL CREDIT | § | |
| MANAGEMENT CORPORATION, | § | |
| | § | |
| Defendant. | § | |
| | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case involves a clear-cut violation of the automatic stay. The defendant, Educational Credit Management Corporation ("ECMC"), garnished the wages of Kristin Bruner-Halteman (the "Plaintiff") thirty-seven times during the pendency of her bankruptcy case without ever seeking or

1

obtaining relief from the automatic stay. The first garnishment occurred on April 20, 2012, a few days after the Plaintiff filed for bankruptcy, and the last garnishment occurred on March 21, 2014, almost two years later. Perhaps the most shocking aspect of this case is that the garnishments continued despite the fact that (1) ECMC received a fax from the Plaintiff's bankruptcy counsel on April 17, 2012 notifying ECMC of the Plaintiff's bankruptcy filing, (2) ECMC received electronic notice of the bankruptcy from the Bankruptcy Noticing Center on or about April 20, 2012, (3) ECMC received ongoing notices regarding the Plaintiff's bankruptcy case, such as the notice of filing of a Chapter 13 plan and the notice of a hearing on confirmation of that plan, (4) ECMC participated in the bankruptcy case by filing a proof of claim on August 16, 2012, (5) the Plaintiff's bankruptcy counsel contacted ECMC again on September 25, 2012 in an attempt to stop the garnishments, and (6) ECMC processed refunds of the garnishments during the bankruptcy case, acknowledging that they occurred in violation of the automatic stay. ECMC issued the first refund roughly one month into the Plaintiff's bankruptcy case, but neither that refund nor the fourteen manually-processed refunds that followed over the course of the next thirteen months were sufficient to deter ECMC from continuing to garnish the Plaintiff's wages in violation of the automatic stay.

The garnishments only stopped when the Plaintiff filed the complaint giving rise to this action (the "<u>Adversary Proceeding</u>"). On April 7, 2014, the same day she filed the Adversary Proceeding, the Plaintiff also filed a separate motion for a preliminary injunction to prevent any garnishment or collection activities by ECMC. After an expedited hearing on April 10, 2014, the Court entered an order on April 15, 2014 enjoining ECMC from garnishing the Plaintiff's wages during the pendency of the Adversary Proceeding.

While ECMC initially filed an answer on May 30, 2014 denying that it violated the automatic stay, ECMC ultimately stipulated to most of the relevant facts, including that it willfully violated the automatic stay.[1] The primary issue remaining for trial was whether the Plaintiff could recover damages for ECMC's violations of the automatic stay, and if so, in what amount. The general idea behind most of the Plaintiff's claims for damages is that the unlawful garnishments caused great stress for the Plaintiff, and that stress exacerbated the Plaintiff's existing medical condition, which, in turn, had widespread negative impacts on the Plaintiff's life. The Plaintiff seeks (1) actual damages, including out-of-pocket expenses, lost wages, emotional distress damages, and attorneys' fees and costs and (2) punitive damages. Trial was held on three consecutive days beginning on November 30, 2015 and ending on December 2, 2015, after which, this Court took the matter under advisement.

The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings, by Federal Rule of Bankruptcy Procedure 7052.[2]

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The matters in this Adversary Proceeding are core matters under 28 U.S.C. § 157(b)(2)(A) and (C), as the Adversary Proceeding involves enforcement of section 362 of the Bankruptcy Code.[3] Venue for this Adversary Proceeding is proper pursuant to 28 U.S.C. § 1409(a).

---

[1] *See* Joint Pretrial Order, Docket No. 67 at 2.

[2] Any Finding of Fact that more properly should be construed as a Conclusion of Law shall be considered as such, and *vice versa*.

[3] To the extent that non-core claims are involved, this Court finds that resolution of such claims is inextricably intertwined with resolution of the core matter of enforcement of the automatic stay in bankruptcy. However, in the event of an appeal, should the appellate court determine that this Court lacked Constitutional authority to enter final

3

**FINDINGS OF FACT**

The Plaintiff is a single mother with a teenage child. At all times relevant to this Adversary Proceeding, she worked at Starbucks Coffee Company ("Starbucks") as a shift manager. The Plaintiff has suffered virtually her entire life from a chronic medical condition that causes her to experience prolonged episodes of uncontrollable vomiting. An episode can last anywhere from a few hours to a few days and generally requires hospitalization. It was first suggested that her medical condition may be cyclic vomiting syndrome during the Plaintiff's visit to the emergency room of Texas Health Presbyterian Hospital in Plano, Texas on May 10, 2013. Her treating gastroenterologist, Dr. Andrew Bolin, later diagnosed the Plaintiff as suffering from cyclic vomiting syndrome. A series of exclusionary tests conducted by Dr. Bolin concluded with reasonable medical certainty that stress was the primary trigger that precipitated the Plaintiff's vomiting episodes.[4] The Plaintiff and her mother both corroborated that the Plaintiff's episodes, as a pattern, occurred when the Plaintiff became agitated or stressed. As of the time of trial, no doctor has been able to conclusively determine the cause of or cure for the Plaintiff's condition.

*The Bankruptcy Filing*

The impetus for the Plaintiff's bankruptcy case involved a student loan. On October 7, 2005, the Plaintiff obtained a student loan from Sallie Mae (the "Student Loan"), which was to be serviced by ECMC. The Plaintiff never made a payment on the Student Loan. ECMC sent a wage

---

judgment on any of the claims, this Court asks the reviewing court to treat these findings of fact and conclusions of law as proposed findings of fact and conclusions of law (*i.e.*, a report and recommendation to be considered *de novo*).

[4] ECMC's expert, gastroenterologist Dr. John M. Hamilton, testified that, based upon his review of the Plaintiff's medical records, he did not conclude that the sole trigger of the Plaintiff's vomiting episodes was stress caused by ECMC's wage garnishments. The Court finds that this testimony does not conflict with that of Dr. Bolin. To the extent a conflict does exist, as Dr. Hamilton never treated or met with the Plaintiff but only reviewed her medical records, the Court finds Dr. Bolin's testimony to be more persuasive.

garnishment letter and order of withholdings to Starbucks on March 21, 2012, directing garnishment of the Plaintiff's wages on account of the Student Loan, on which the Plaintiff then allegedly owed $5,053.50. The Plaintiff also received the same or a similar document regarding wage garnishment around the same time. After consulting with a lawyer, she filed bankruptcy under chapter 13 (the "Bankruptcy Case") on April 17, 2012 to stop the garnishment.

### *ECMC's Knowledge of the Bankruptcy Case*

ECMC received notice of and was aware of the Bankruptcy Case prior to any post-petition garnishment of the Plaintiff's wages. On the date that the Plaintiff filed the Bankruptcy Case, the Plaintiff's attorney sent a fax to ECMC giving notice of the Bankruptcy Case, which ECMC received. ECMC also received electronic notice of the Bankruptcy Case and the section 341 creditor's meeting on or about April 20, 2012 from the Bankruptcy Noticing Center, notice of the Plaintiff's chapter 13 plan on or about May 1, 2012, notice of the hearing on confirmation of the Plaintiff's chapter 13 plan on or about May 17, 2012, and notice of a hearing on the Chapter 13 Trustee's recommendations related to claims, objections to claims, and plan modification on or about April 17, 2013. The Plaintiff listed ECMC as a creditor on her bankruptcy schedules. ECMC participated in the Bankruptcy Case by filing a proof of claim on August 16, 2012. During the Bankruptcy Case, ECMC received a phone call from the Plaintiff, confirming that she was in bankruptcy and even providing the Bankruptcy Case number. The Plaintiff's bankruptcy counsel also called ECMC again on September 25, 2012 in an attempt to stop the garnishment.

5

*The Continuing Garnishment*

Despite being aware of the Bankruptcy Case, ECMC garnished the Plaintiff's wages on thirty-seven occasions post-petition.[5] These garnishments generally constituted approximately 13% of the Plaintiff's gross pay and totaled $3,224.04 between April 2012 and April 2014.[6] ECMC did not stop garnishing the Plaintiff's wages until after the Plaintiff filed this Adversary Proceeding on April 7, 2014.

ECMC did provide refund checks to the Plaintiff on eighteen occasions between May 24, 2012 and May 16, 2014. These refunds totaled $3,331.96.[7] The Plaintiff generally received these refunds between one and two months from the date of garnishment. As a result of the refunds, the Plaintiff was not permanently deprived of money, but because of the delay between the garnishments and the refunds, the Plaintiff generally had between $200 and $400 less than she should have had at any given time. When refunds for November 30, 2012 through April 19, 2013

---

[5] The dates and amounts of these garnishments were as follows in 2012: $95.83 on April 20; $113.19 on May 4; $101.74 on May 18; $105.90 on June 1; $93.46 on June 15; $106.28 on June 29; $113.02 on July 13; $105.25 on July 27; $106.98 on August 10; $109.78 on August 24; $86.76 on September 21; $94.82 on October 5; $103.50 on October 19; $106.07 on November 2; $106.61 on November 16; $116.26 on November 30; $105.90 on December 14; $108.84 on December 28. Garnishments occurred as follows in 2013: $89.84 on January 11; $9.04 on February 22; $80.99 on March 8; $45.89 on March 22; $39.69 on April 5; $81.98 on April 19; $42.11 on June 28; $24.65 on July 12; $26.12 on July 26; $4.39 on August 9; $99.68 on October 18; $90.98 on November 1; $93.33 on November 29; $110.89 on December 13; $105.50 on December 27. Garnishments occurred as follows in 2014: $113.65 on January 10; $113.93 on January 24; $75.32 on February 7; $95.87 on March 21. Garnishments did not occur on September 7, 2012, January 25, 2013, February 8, 2013, May 3, 2013, May 17, 2013, May 31, 2013, June 14, 2013, August 23, 2013, September 6, 2013, September 20, 2013, October 4, 2013, November 15, 2013, or March 7, 2014 because the Plaintiff did not earn enough wages during these pay periods to permit garnishment under applicable law.

[6] The Plaintiff's Bankruptcy Case was dismissed without prejudice on August 26, 2013 due to her failure to make plan payments, which were $200 past due at the time. This dismissal was vacated and the Bankruptcy Case reinstated on October 7, 2013. ECMC received notice of the dismissal and reinstatement of the Bankruptcy Case. No garnishment occurred during this gap period between dismissal and reinstatement, as the Plaintiff did not make enough wages during that time period.

[7] The Court believes that the total amount refunded exceeds the total amount garnished because evidence of a final garnishment in early April 2014 was not presented at trial. In all likelihood, however, the total amount garnished and the total amount refunded are the same. In any event, there is no evidence of any remaining amounts that have not yet been refunded.

were not sent until June 11, 2013, this deficit grew to almost $700, and when refunds for June 2013 through March 2014 were not sent until April and May of 2014, the deficit swelled to almost $1,000.

### *The Plaintiff's Financial Situation*

Like many Chapter 13 debtors in cases before this Court, the Plaintiff lives on the ragged edge where any adversity can be catastrophic. ECMC's wage garnishments thinned an already slight cushion that existed between the Plaintiff's monthly income and expenses. The Plaintiff's monthly expenses totaled $1,077. The Plaintiff's monthly chapter 13 plan payment, which she began making in May 2012, was $100. After deductions, including wage garnishments, the Plaintiff's take-home pay from Starbucks for the months of April and May 2012 was $961.51 and $953.73, respectively. The Plaintiff also received monthly alimony, maintenance or support payments in the amount of $300. Together, these amounts combined for a take-home income of $1,261.51 in April 2012 and $1,253.73 in May 2012. Had ECMC halted garnishment of the Plaintiff's wages after the Bankruptcy Case was filed, the Plaintiff's monthly income for April and May 2012 would have been $1,470.53 and $1,461.37, respectively. In an attempt to supplement her income, the Plaintiff did whatever she could, including selling personal items, participating in paid product trials, and newspaper delivery.

When an individual is living on a tight budget, depriving her of even a small amount of cash can have significant effects on her ability to meet her obligations. In this case, ECMC's post-petition wage garnishments disrupted the Plaintiff's financial situation at a time when the balance of income and expenses was particularly delicate.

### *The Plaintiff's Living Situation*

The Plaintiff and her son lived in the Plaintiff's mother's house from roughly 2005 through March of 2012. This arrangement worked well because the Plaintiff's mother traveled extensively for work, but the Plaintiff's mother moved back into the house in early 2012, creating a cramped situation in which the Plaintiff was forced to sleep on a couch. The Plaintiff was able to move into a townhome with her son in March of 2012. The monthly rent for the townhome was $500, but because she was unable to afford the full monthly rent, the Plaintiff moved back into her mother's house around the end of May 2012 and found a friend to sub-lease the townhome to so that the Plaintiff would only have to pay half of the monthly rent. The Court finds that ECMC's wage garnishments contributed to the need for the Plaintiff and her teenage son to move back into her mother's house.

After the Plaintiff and her teenage son moved back into her mother's residence, the Plaintiff's mother began traveling again for work from December 2012 until March 2013. After March 2013, the relationship between the Plaintiff and her mother became strained as a result of the living situation at the house, the financial stress caused by the Plaintiff's medical bills and other expenses like school supplies or clothes for her teenage son, and the Plaintiff's inability to continue her pursuit of a management position at Starbucks. The Plaintiff's mother loaned the Plaintiff money, in part from her retirement account, to help with expenses in August 2013.

### *The Plaintiff's Work Situation*

The Plaintiff was a longtime employee of Starbucks but was actively attempting to advance within the ranks of Starbucks during her Bankruptcy Case. She rose to the level of shift manager in January 2012 and thereafter continued to actively pursue training that was necessary for an

assistant manager position. The Plaintiff earned an hourly wage at Starbucks during her employment, but her desired position of associate manager would have been salaried.

Even during the best of times, the Plaintiff's work schedule at Starbucks was somewhat erratic, and the Plaintiff had to do whatever she could to get as many hours as possible. At times, the Plaintiff had to work until midnight and then start work again at 4:00 am the following morning. She got into the habit of not sleeping between these shifts.

The Plaintiff's hours at Starbucks fluctuated throughout the Bankruptcy Case due to medical issues, including vomiting episodes, typical seasonal lulls in the market, and store transfers. Intermittent decreases in hours, as well as ECMC's continued wage garnishments, caused the Plaintiff significant stress. During the bi-weekly pay periods from April 2, 2012 through August 19, 2012, October 1, 2012 through December 23, 2012, and November 25, 2013 through January 19, 2014, the Plaintiff worked between 70 and 85 hours per pay period. At times, however, a lack of customer traffic caused significantly fewer hours to be allocated to the Plaintiff for work. Starbucks also required the Plaintiff to take vacation in August and September 2012, when the Plaintiff visited her family in California, after her grandmother's death.

In January 2013, the Plaintiff transferred to a new Starbucks location, despite the prospect of fewer hours, in order to be trained for a management position. Almost immediately after transferring to the new store, the Plaintiff contracted the flu and needed to take time off from work. Shortly after she returned to the new store, she had a vomiting episode. This appears to have been the first vomiting episode that the Plaintiff had during the Bankruptcy Case. The Plaintiff believes that this episode and the time she needed to recover caused the manager who was training her to lose faith in her, and the hours of work she was allocated severely decreased after her return. The

Plaintiff later transferred stores again in the fall of 2013 in an attempt to increase her hours for the purposes of qualifying for health insurance.

### *The Plaintiff's Medical Situation*

Throughout 2013 and 2014, the Plaintiff suffered multiple uncontrollable vomiting episodes. She was admitted to Texas Health Presbyterian Hospital on May 10, May 12, and October 29 of 2013, Centennial Medical Center on February 2 and July 27 of 2014, and then Texas Health Presbyterian Hospital again on August 6, 2014. The Plaintiff also had appointments with Dr. Bolin after most hospital visits as well as other follow-up appointments. These episodes caused the Plaintiff to take time away from work and also cost her and her relatives money out-of-pocket, as her insurance was suspended mid-October because she failed to work the requisite minimum hours at Starbucks. As previously noted, Dr. Bolin testified that stress was the primary trigger that precipitated the Plaintiff's vomiting episodes. The Plaintiff believes that stress triggered her episodes during 2013 and 2014 and that her stress was caused by ECMC's wage garnishment.

No medical or psychological evidence isolating the type or cause of stress that triggered or exacerbated these episodes was presented in this Adversary Proceeding. ECMC's medical expert gastroenterologist, Dr. Hamilton, testified that stress due to ECMC's wage garnishments would be impossible to isolate as a trigger for the Plaintiff's vomiting episodes. Dr. Bolin similarly testified that definitively identifying a particular type and cause of stress that precipitated the Plaintiff's vomiting episodes would be medically impossible in the Plaintiff's case. While the Plaintiff's episodes occurred before the garnishment began and continued after the garnishment concluded, ECMC's wage garnishments were clearly a source of stress that most likely contributed to the

increasing frequency of the Plaintiff's episodes in 2013 and 2014, but were not the only source of stress.[8]

### *ECMC's Policies, Procedures, and Practices*

ECMC's policies, procedures, and practices in place during the garnishment of the Plaintiff's wages were, to put it charitably, inadequate to prevent wage garnishments after the Plaintiff's bankruptcy filing. The wage garnishments directly resulted from inadequacies in ECMC's system that did not automatically cancel active wage garnishments for the accounts of debtors identified as being in bankruptcy, including the Plaintiff's account. ECMC failed to address these systematic inadequacies despite requests from its bankruptcy department for changes and ECMC's awareness that the problems existed and would likely lead to, and did lead to, automatic stay violations.

At trial, the Plaintiff introduced Exhibit 60, which purports to document the pervasiveness of ECMC's unlawful post-petition garnishments based on internal reports that were generated by ECMC and obtained by the Plaintiff through discovery. Exhibit 60 attempts to summarize information from Exhibits 61-71 to show how many debtors had their wages garnished in violation of the automatic stay by ECMC. The problem is that the Plaintiff relies on assumptions and guesswork to go from the raw data in Exhibits 61-71 to the conclusions in Exhibit 60. Over the objection of ECMC, the Court admitted Exhibit 60 into evidence noting that ECMC's criticisms of Exhibit 60 would go toward the weight of the evidence. The Court now notes that because of the numerous issues with the reliability of the Plaintiff's compilation of this data, Exhibit 60 was given no weight. This is not to say that the Court disagrees with the general proposition of Exhibit

---

[8] For example, the Plaintiff's episode in May 2013 occurred at a time when her hours were so low that her wages were not being garnished.

60 that stay violations were occurring for a large number of debtors.  Based on the testimony of ECMC's employees regarding ECMC's policies, procedures, and practices during the time period of the garnishments in this case, it is abundantly clear that the post-petition garnishment of the Plaintiff's wages in violation of the automatic stay was not an isolated incident.  Rather, the problem was fairly common.

When ECMC received notice that one of their debtors filed for bankruptcy, the procedure was for the bankruptcy department to remove the account from collection status and to check to see if the debtor's wages were currently being garnished.  If a wage garnishment was in place for a debtor, the bankruptcy processor was supposed to send an e-mail to the wage garnishment department to send a release of the garnishment.  The only way for the bankruptcy department to know that a wage garnishment was in place for a debtor, however, was to look at the transaction history of the account and see that ECMC had already received garnished amounts.  The problem was that just looking for garnished amounts in the transaction history was an unreliable method of determining whether there was an active garnishment for an account.  An ECMC employee in the bankruptcy department called attention to this problem and requested a fix for it in the software that ECMC uses, but ECMC failed to address the issue.

After the initial case creation, the bankruptcy department processors would not check for wage garnishments again at any other point in a bankruptcy case, unless they were directly responding to a complaint about a wage garnishment.  Even if the debtor or their attorney placed a direct call to ECMC attempting to stop a garnishment though, they were required to provide specific information, including a case number, the county the bankruptcy was filed in, and the name of the court.  If the debtor did not provide all of that information when calling in to ECMC, the policies in place during the wage garnishments in the Plaintiff's case appear to direct that

collections on an account should continue and should only stop after the debtor provided post default services with "a copy of their bankruptcy documents."

There was no written policy or procedure requiring employees responsible for payment processing, or refund processing, to take action to stop repeated garnishments, even when it was obvious that they should not have been occurring. ECMC employees would run periodic reports to identify garnishment payments received from borrowers in an active bankruptcy so that they could issue refunds of the amounts garnished, but ECMC's policy and procedure was to simply refund the garnished amounts, not to cancel the active garnishment. In short, ECMC did not have adequate policies or provide training for employees in collections and payment processing regarding the cancellation of wage garnishments for the account of a debtor in active bankruptcy. In the Plaintiff's case, a refund processor even verified the Plaintiff's bankruptcy in PACER and entered this information in her transaction history, yet no action was ever taken to stop the wage garnishments until after the Adversary Proceeding was filed.

The policies in place at the time of the Plaintiff's wage garnishments were clearly inadequate and led to the regular violation of the automatic stay for the Plaintiff as well as numerous other debtors in active bankruptcies. ECMC's refund of garnished wages on the accounts of debtors in active bankruptcy, especially on an *ad hoc* basis, was inadequate to prevent the harm caused by its willful wage garnishments, and in fact, reflects the intentional nature of its garnishments under a knowingly inadequate system.

ECMC revised its policies and updated its software after the Adversary Proceeding was filed. It is not clear to the Court that the deficiencies in ECMC's policies, procedures, and practices have been resolved.

**CONCLUSIONS OF LAW**

ECMC knew of the existence of the automatic stay shortly after the Plaintiff filed her Bankruptcy Case, but ECMC nevertheless intentionally garnished the Plaintiff's wages on thirty-seven occasions after her Bankruptcy Case was filed. These thirty-seven post-petition wage garnishments constitute willful violations of the automatic stay under Bankruptcy Code sections 362(a)(3) and (a)(6). Because the Plaintiff was injured by ECMC's willful violation of Bankruptcy Code sections 362(a)(3) and (a)(6), the Plaintiff is entitled to recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages.

*Actual Damages*

The Plaintiff seeks the following actual damages:

(i) $605 for the amount paid for COBRA health insurance to cover the period when the Plaintiff lost the health insurance available through Starbucks because her hours fell below the required threshold;

(ii) $12,000 for money that the Plaintiff borrowed from her mother to pay medical expenses;

(iii) $5,000 for property that the Plaintiff sold to make ends meet during the Bankruptcy Case;

(iv) $6,661.20 for lost wages at Starbucks in 2013 due to the Plaintiff's inability to work;

(v) $410.55 for lost wages at Starbucks in 2014 due to the Plaintiff's inability to work;

(vi) $28,900.92 for lost income at Starbucks in 2014 because the Plaintiff was unable to advance within Starbucks due to lack of attendance;

(vii) $28,900.92 for lost income at Starbucks in 2015 because the Plaintiff was unable to advance within Starbucks due to lack of attendance;

(viii) $200,000 for emotional distress; and

(ix) attorneys' fees.

The general theory underlying the vast majority of the damages requested by the Plaintiff is that the garnishments caused stress, that stress caused vomiting episodes, and those vomiting

episodes caused medical bills, an inability to work, and emotional distress. The primary problem in assessing and calculating actual damages, therefore, is one of causation. While the vomiting episodes caused medical bills, an inability to work, and emotional distress, and it seems relatively clear that stress was a trigger for the vomiting episodes, it is much more difficult to find the causal connection between the garnishments and the particular stress that triggered the vomiting episodes.

ECMC's post-petition wage garnishments contributed to, but were not the sole cause of stress in the Plaintiff's life during the pendency of the Bankruptcy Case. Indeed, the Plaintiff had many sources of stress both before and throughout the Bankruptcy Case relating to her financial situation, her medical situation, her job situation, her living situation, and her family relationships. For instance, not being able to meet all of her financial obligations prior to and during the Bankruptcy Case was a significant cause of stress, but this was not solely caused by the wage garnishments. At times, the Plaintiff's income suffered because Starbucks did not allocate her enough hours. The lack of hours was caused by a number of factors, including typical seasonal lulls in the market, requisite vacation leave, the Plaintiff's voluntary transfer (in pursuit of management training) to a Starbucks that would provide her with fewer hours, her contraction of the flu at the inconvenient time of a work transfer, and uncontrollable vomiting episodes. Even when the Plaintiff did get hours at Starbucks, the timing of those shifts was a source of stress. The Plaintiff's medical condition itself, which she has struggled with nearly all her life and continues to struggle with, was undoubtedly a source of stress and also something that contributed to her financial stress as it affected her work hours. Additionally, the Plaintiff's living situation and strained relationship with her mother added stress to her life throughout the Bankruptcy Case. Although ECMC's garnishment of the Plaintiff's wages thinned the financial cushion needed to pay for separate housing, the Court cannot conclude from the evidence that the wage garnishments

were the sole or primary cause of the Plaintiff's move back into her mother's residence or responsible for the strain in their relationship. The challenge that all of these simultaneous issues present is that they seem to be both causes and effects of stress, so they feed off of each other.

It is apparent that stress is the primary trigger for the Plaintiff's vomiting episodes, but the Court cannot conclude that the uncontrollable vomiting episodes that the Plaintiff suffered during the relevant time period were specifically caused by the stress from ECMC's wage garnishments. Without this causal connection, the Plaintiff has not met her burden of proving by a preponderance of the evidence that the garnishment of her wages caused her to borrow money from her mother to pay medical bills, that she was required to obtain COBRA health insurance for a period of time because of the garnishment of her wages by ECMC, or that she missed work or was denied a promotion at Starbucks because of the garnishment of her wages by ECMC. Even if the Court could conclude that this particular stress caused the Plaintiff's uncontrollable vomiting episodes, the Court was not provided sufficient evidence to measure the medical costs or lost wages that resulted.

While the lack of a causal connection between the garnishments and the vomiting episodes does not necessarily preclude recovery of emotional distress, the Plaintiff has not otherwise met her burden of proving by a preponderance of the evidence that she suffered significant emotional distress that was specifically caused by ECMC's garnishment of her wages.

The Court also finds that the Plaintiff did not meet her burden of proving by a preponderance of the evidence that she suffered damages in the amount of $5,000 related to her selling personal items as a result of ECMC garnishing her wages. Even if the Court could conclude that the garnishment of the Plaintiff's wages caused her to sell personal items, the Court was not provided sufficient evidence to measure the damages that resulted.

The Plaintiff did incur attorneys' fees as a direct result of ECMC's willful violations of the automatic stay, and she is entitled to recovery of her reasonable attorneys' fees as actual damages. At trial, the Court ruled on the record that pre-litigation attorneys' fees up to the preparation of the Adversary Proceeding were admissible but that the Plaintiff would have to wait until she won on those to present evidence regarding the additional attorneys' fees incurred from the litigation preparation forward, but the Court ultimately allowed evidence regarding attorneys' fees that were incurred through April 10, 2014, which was the date of the hearing on the Plaintiff's motion for a preliminary injunction. The attorneys' fees incurred in filing the complaint and filing and prosecuting the motion for a preliminary injunction were a necessary part of stopping the garnishments because none of the previous actions that were taken by the Plaintiff, or on behalf of the Plaintiff, proved effective. The total amount of reasonable attorneys' fees incurred through April 10, 2014 was $8,395, and that amount will be awarded to the Plaintiff as actual damages.

In the context of an action under Bankruptcy Code section 362(k), actual damages include reasonable attorneys' fees that were incurred in prosecuting a stay violation. *Young v. Repine (In re Repine)*, 536 F.3d 512, 522 (5th Cir. 2008). The Court will hold a separate post-trial hearing (the "Post-Trial Hearing") to determine the amount of the Plaintiff's reasonable attorneys' fees incurred after April 10, 2014. The Plaintiff should file an application for such attorneys' fees and obtain a setting for the Post-Trial Hearing for the Court to consider the application.

### *Punitive Damages*

Bankruptcy Code section 362(k) allows punitive damages "in appropriate circumstances." The Fifth Circuit Court of Appeals has endorsed an "egregious conduct" standard for ascertaining "appropriate circumstances." *In re Repine*, 536 F.3d at 521. As discussed below, this case easily meets the requirements for an award of punitive damages.

ECMC's systematic, knowing, and willful disregard of the automatic stay and the protections afforded a debtor by the bankruptcy system were particularly egregious and offend the integrity of the bankruptcy process. The collections system employed by ECMC was not only inadequate to comply with the automatic stay imposed under the Bankruptcy Code in the case of the Plaintiff, it also had the potential to, and most likely did, result in stay violations in numerous other active bankruptcy cases. The indifference shown by ECMC to the Plaintiff and the bankruptcy process in this case is gravely disturbing.

While ECMC claims that it sent a cancellation order to Starbucks to stop the garnishment early in the Bankruptcy Case, this does not excuse its behavior. The garnishments continued despite the Plaintiff's bankruptcy counsel contacting ECMC representatives months later to tell them that the improper garnishments were still occurring. This phone call should not have been necessary, of course, since ECMC was consistently receiving either a garnished amount or a letter from Starbucks explaining that the Plaintiff did not earn enough money during a given pay period to be garnished. ECMC was aware that the garnishment was ongoing, and ECMC employees across multiple departments ignored the obvious, recurring stay violations.

The callousness of the refund process is particularly rattling. In order to process a refund, an ECMC employee had to make the determination that the debtor had an active bankruptcy case, but that did nothing to convince ECMC that it should be cancelling the wage garnishments for those debtors. Instead, ECMC continued to process refunds at whatever pace it chose while the Plaintiff was doing everything she could to make ends meet. The refund process implemented by ECMC on an *ad hoc* basis does not bring its collections system into compliance with the Bankruptcy Code or negate the egregiousness of ECMC's willful violations of the automatic stay.

While ECMC presented evidence regarding updated and revised policies, as of the time of trial, the Court is not convinced that ECMC has cured the systematic inadequacies in ECMC's collections and bankruptcy notification policies, procedures, and training.

In determining the amount of punitive damages to award, the Court considers (1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the harm or potential harm to the plaintiff and the punitive damages, and (3) the difference between penalties imposed in comparable cases. *BMW of N. Am. v. Gore*, 517 U.S. 559, 574-75 (1996).

Under the circumstances, the Court finds it appropriate to award punitive damages in the amount of $2,000 per offense for each of the thirty-seven post-petition garnishments, resulting in a total punitive damages award of $74,000. The Court believes this award of punitive damages falls within the three guideposts provided in *Gore*. ECMC's conduct was so reprehensible as to warrant the imposition of these punitive damages to achieve punishment and deterrence.

*Mitigation*

ECMC argues that the Plaintiff did not take reasonable steps to mitigate her damages, and they should be reduced accordingly. This mitigation argument is based on the fact that from September 26, 2012 until April 7, 2014 when the Adversary Proceeding was filed, neither the Plaintiff nor any of her attorneys contacted ECMC again about the continued garnishment of the Plaintiff's wages. The Court will not reduce damages based on this mitigation argument. Based on the Findings of Fact, the Court concludes that the Plaintiff took reasonable steps to mitigate damages in this case, including contacting her attorneys to alert them to the ongoing garnishment, contacting ECMC directly when the garnishment did not cease, and relying on her bankruptcy counsel when she was advised not to contact ECMC directly again.

In addition, it is not a debtor's job to hound a creditor to comply with the automatic stay. Once a creditor learns of the bankruptcy filing and the stay, it is the obligation of the creditor to comply with the law or suffer the consequences provided in the Bankruptcy Code.

### **CONCLUSION**

The facts presented in this case thankfully do not happen often. A sophisticated creditor, ECMC, active in many cases in this district and across the country, decided that it would continue to garnish a debtor's wages with full knowledge that she was in a pending bankruptcy case. The Plaintiff, a woman who suffers from a severe medical condition, was hurt in the process. She was deprived of the full use of her paycheck. She incurred significant attorneys' fees in trying to fix the situation. A garnishment of a few hundred dollars may not be much to everyone, but to Kristin Bruner-Halteman, it meant a lot.

The Court has declined to award emotional distress damages and those that flow from such claims, not because it does not believe that the Plaintiff has the illness she claims, or that it is triggered by stress as she claims, but only because the Court could not find sufficiently direct causation, nor compute damages that might flow from such a finding. However, for the automatic stay to have meaning and to protect the integrity of the bankruptcy process, this is certainly a case where actual and punitive damages, including attorneys' fees, are more than appropriate. Creditors such as ECMC cannot be allowed to ignore the protections afforded to debtors by the Bankruptcy Code without paying a price. In life and in law, actions have consequences.

By separate judgment, the Court will award actual damages in the amount of $8,395 plus any additional attorneys' fees that the Plaintiff is awarded at the Post-Trial Hearing and punitive damages in the amount of $74,000. Judgment will not be entered until after the Post-Trial Hearing.

###End of Findings of Fact and Conclusions of Law###